# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIVE ECOSYSTEMS COUNCIL; THE
ECOLOGY CENTER, INC.,
             *Plaintiffs-Appellants,*

             v.

UNITED STATES FOREST SERVICE, an
agency of the U.S. Department of
Agriculture; THOMAS CLIFFORD,
supervisor, Helena National
Forest; KATHLEEN MCALLISTER,
Deputy Regional Forester for
Region One U.S. Forest Service;
DALE BOSWORTH, Chief of the
United States Forest Service,
             *Defendants-Appellees.*

No. 04-35375

D.C. No.
CV-02-00080-DWM

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued February 14, 2005
Submitted August 11, 2005
Seattle, Washington

Filed August 11, 2005

Before: Betty Binns Fletcher, M. Margaret McKeown, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

---

**COUNSEL**

Thomas J. Woodbury, Forest Defense, P.C., Missoula, Montana, for the plaintiffs-appellants.

Todd S. Aagaard, Michael T. Gray, Department of Justice, Washington, D.C., for the defendants-appellees.

---

**OPINION**

GOULD, Circuit Judge:

Native Ecosystems Council and The Ecology Center (collectively referred to as "NEC") appeal the district court's grant of summary judgment to the United States Forest Service ("Forest Service") on NEC's claims in connection with

the Forest Service's approval of the North Elkhorns Vegetation Treatment Project ("Elkhorn project" or "proposed project"). The Elkhorn project is a "wildlife improvement project involving a timber sale" within the Helena National Forest and the Elkhorn Wildlife Management Unit ("Elkhorn Wildlife Unit"), the only Wildlife Management Unit in the National Forest System. NEC contends that the Forest Service's approval of the Elkhorn project was arbitrary and capricious, in violation of the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, because the project violates the "big game" standards of the Helena National Forest Plan ("HNF Plan"). NEC also argues that the Forest Service's approval of the Elkhorn project is arbitrary and capricious because the project will threaten the forest-wide viability of the Northern Goshawk. We have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse and remand.

# I

The Helena National Forest comprises 975,088 acres of west-central Montana and includes a broad expanse of the Elkhorn Mountains. The Helena National Forest is managed in accord with the HNF Plan, adopted pursuant to NFMA in 1986.[1] Among other requirements, the HNF Plan contains

---

[1]NFMA sets the statutory framework for the management of our National Forest lands. 16 U.S.C. § 1604. NFMA establishes a two-step process for forest planning. First, NFMA requires the Forest Service to develop and maintain a Forest Plan for each unit of the National Forest System. *See id.* § 1604(a). Each Forest Plan must set forth multiple use objectives to ensure recreation uses, maintain a diversity of plant and animal species, maintain the viability of native species, and enable timber yield from the forests. *See id.* § 1604(e). NFMA also requires that the Forest Service adopt regulations specifying guidelines for forest plans. *Id.* § 1604(g)(3); *see* 36 C.F.R. § 219 *et seq.*

Second, under NFMA, the Forest Service implements each Forest Plan by approving or disapproving site-specific actions. All proposed projects must be consistent with the overall forest plan. 16 U.S.C. § 1604(i).

standards relating to the security of big game species such as elk, including the requirement that each elk herd have at least thirty-five percent "hiding cover."[2] The HNF Plan's elk hiding cover standard is central to NEC's claims, and we examine it in detail in Section II.

The Elkhorn Mountains are also the home of the only designated Wildlife Management Unit in our National Forest System, the Elkhorn Wildlife Unit. In 1976, Congress directed the Forest Service to evaluate 77,346 acres of Helena and Deerlodge National Forests for designation as a Wilderness Area. Wilderness Act of 1976, Pub. L. No. 94-557, 90 Stat. 2633, 2637. Prompted by "the presence of valuable wildlife resources, and the predominance of public concern for wildlife values in the area," the Forest Service instead recommended the establishment of a special management unit with a management direction emphasizing wildlife. The subsequently created Elkhorn Wildlife Unit encompasses areas of both the Helena and Deerlodge National Forests in Montana, including the area of the proposed project. The Elkhorn Wildlife Unit has its own standards, with which any site-specific projects must comply and which have been incorporated into the HNF Plan. Relevant to this appeal, the Forest Service is only to consider "land management activities" in the Elkhorn Wildlife Unit when "they are compatible with management direction for wildlife." The Elkhorn Wildlife Unit is also generally "unsuitable for timber management, because the land is proposed for use that precludes timber harvest on the programmed basis."

---

[2]"Hiding cover" is a "timber stand which conceals 90 percent or more of a standing elk at 200 feet." The Elkhorn Mountains are one of the most heavily-hunted areas in the State of Montana, and hiding cover is one of several elements of elk security in the Elkhorn Mountains. Elk security is the "protection inherent in any situation that allows elk (and presumably deer) to remain in defined areas despite an increase in stress or disturbance associated with the hunting season or other human activities."

In 1996, the Forest Service proposed an amendment to the Helena and Deerlodge National Forest Plans called the "Elkhorn Forest Plan Amendment," seeking to alter the direction of the Elkhorn Wildlife Unit from its wildlife emphasis to a more general "ecosystem management."[3] The district court upheld a challenge by environmental groups, concluding that the Plan amendment was "significant" and that the Forest Service had violated NEPA by not preparing an Environmental Impact Statement ("EIS") for the proposed amendment.[4] *Am. Wildlands v. U.S. Forest Serv.*, No. CV 97-160-M-DWM, 1999 U.S. Dist. LEXIS 22243, at *22-*23 (D. Mont. 1999). The Forest Service thereafter abandoned the Elkhorn Forest Plan Amendment. However, the Forest Service was not precluded by the district court's decision from pursuing future projects within the Elkhorn Wildlife Unit, so long as any proposed projects were consistent with the 1986 HNF Plan, NFMA, and NEPA.

The Forest Service proposed the Elkhorn project in 2000. After completing an Environmental Impact Statement ("EIS") and Record of Decision ("ROD") in 2001, the Forest Supervisor chose Alternative 2, the harvesting of 655 acres within a

---

[3]This would have placed other goals and objectives such as mining, timber, and grazing on par with wildlife conservation.

[4]Unlike NFMA, NEPA does not "mandat[e] that agencies achieve particular substantive environmental results." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989). Rather, agencies must comply with NEPA's procedural requirements, ensuring both that the agency "carefully consider" a project's environment impacts, and that the "relevant information will be made available," so that the public can "play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

Among other procedural requirements, NEPA requires that federal agencies prepare an EIS for major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C). An EIS must provide a "full and fair discussion of significant environmental impacts," and inform "decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

755-acre area of forest in the northwest corner of the Elkhorn Wildlife Unit.[5] Because the Elkhorn Wildlife Unit is classified under the HNF Plan as "unsuitable" for timber harvest, the Elkhorn project is not a "timber sale per se, it is a wildlife habitat improvement project that will involve a timber sale (commercial thinning) as the tool to achieve part of the desired condition." The Forest Supervisor concluded that such land can be logged under NFMA for the "purpose of meeting other objectives if the Forest Plan establishes that such actions are appropriate." (citing 36 C.F.R. § 219.27 (1999)). The project's stated purpose is to improve wildlife habitat through the "rejuvenat[ion]" of "the winter range forage base for species such as deer, elk, and moose," and the creation of "a sustainable forest structure that would eventually provide [more] suitable habitat" for other wildlife species. The proposed project would create a "broad swath of open forest (approximately 3 miles long and 1/4 to mile wide)," reconstruct a road, and construct a non-motorized loop trail.

The 2001 EIS concluded that the project complied with the HNF Plan's "Big Game" requirements. Specifically, the EIS concluded that the project would leave the affected elk herd, the Sheep Creek elk herd, with fifty-seven percent hiding cover, above the thirty-five percent hiding cover minimum required by the HNF Plan.[6]

After the Forest Service published the Elkhorn project EIS and ROD, NEC filed an administrative appeal, which was denied. NEC then filed suit in the United States District Court

---

[5]The section of forest involved is not old-growth forest.

[6]According to the EIS, the Sheep Creek elk herd has 14,112 acres of hiding cover available to it, of which the Elkhorn project would eliminate 620 acres. The EIS used the 24,000 acres of the 46,000 Sheep Creek Elk Herd Unit within the Helena National Forest as the denominator of its hiding cover calculation. Thus, the EIS concluded that the Sheep Creek elk herd has a hiding cover percentage of fifty-nine percent, and, after the action approved by the Forest Service, would still have fifty-seven percent hiding cover.

for the District of Montana, arguing that the Forest Service's approval of the Elkhorn project violated NEPA, NFMA, and the APA.

The parties filed cross-motions for summary judgment. The district court granted the Forest Service's motion, concluding that the agency's analysis of the proposed project's impacts was sufficient to meet the requirements of NFMA and NEPA as well as the requirements of the HNF Plan. The district court noted that the Forest Service had altered the acreage denominator of its elk hiding cover analysis from previous hiding cover analyses, which had concluded that the Sheep Creek elk herd was generally below the hiding cover minimum as calculated over the herd's entire range. The Forest Service's change to the 2001 calculation methodology consequently boosted the percentage of cover present after the project to within the range allowable under the HNF Plan. The district court called the Forest Service's change "convenient, or even suspicious," but concluded that "its appropriateness is not something this court can determine." This timely appeal followed.

## II

NEC argues that the Elkhorn project does not comply with the HNF Plan's "big game" hiding cover requirements and therefore does not comply with NFMA. *See* 16 U.S.C. § 1604(i). NEC also argues that the Elkhorn project EIS is deficient under NEPA because it used an incorrect hiding cover calculation to reach the conclusion that the project complied with the HNF Plan.

## A

We review de novo a grant of summary judgment. *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1086 (9th Cir. 2004). Our review of agency decision-making under NFMA is governed by the judicial

review provisions of the APA because NFMA does not contain an express provision for judicial review. 5 U.S.C. § 706(2)(A); *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059, 1065 (9th Cir. 2004). Under the APA, we may set aside agency action only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc). Although the arbitrary and capricious standard is a "narrow one," we are required to "engage in a substantial inquiry[,] . . . a thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). To have not acted in an arbitrary and capricious manner, the agency must present a "rational connection between the facts found and the conclusions made." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir. 2004).

Agencies are entitled to deference to their interpretation of their own regulations, including Forest Plans. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097, 1099 (9th Cir. 2003); *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1154 (9th Cir. 1998). However, an agency's interpretation "does not control, where . . . it is plainly inconsistent with the regulation at issue." *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1069 (9th Cir. 1998); *see Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (explaining that no deference is due to an agency interpretation that contradicts the regulation's plain language). We "may not defer to an agency decision that 'is without a substantial basis in fact' " and cannot uphold a decision based on a "clear error of judgment." *Sierra Club v. U.S. EPA*, 346 F.3d 955, 961 (9th Cir. 2003) (quoting *Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 463 (1972) and *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Our review for compliance with NEPA also occurs under the APA, which authorizes courts to set aside agency actions adopted "without observance of procedure required by law." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1165 (9th Cir. 2003) (quoting 5 U.S.C. § 706(2)(D)). In reviewing the adequacy of an EIS, we apply the "rule of reason" standard, which requires "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). Stated differently, our "task is to ensure that the agency has taken a 'hard look' at the potential environmental consequences of the proposed action." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004) (citation omitted).

## B

The Elkhorn Mountains are one of the most heavily hunted areas in the State of Montana. The HNF Plan includes several standards to maintain or improve big game security and to maintain adequate big game habitat for species like elk and mule deer:

Big Game

1.   On important summer . . . and winter range, adequate thermal and hiding cover will be maintained to support the habitat potential.

2.   An environmental analysis for project work will include a cover analysis. The cover analysis should be done on a drainage or elk herd unit basis. . . .

3.   Subject to hydrologic and other resource constraints, elk summer range will be maintained at 35 percent or greater hiding cover and areas of winter

range will be maintained at 25 percent or greater thermal cover in drainages or elk herd units.

4. Implement an aggressive road management program to maintain or improve big game security. . . .[7]

## 1

[1] The 2001 EIS describes the hiding cover standard as "not [a] very meaningful" measure of the Forest Service's duty to provide for elk security in the Helena National Forest and Elkhorn Wildlife Unit. It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA. As NFMA makes plain, "[r]esource plans, permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i); *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1062 (9th Cir. 2002) ("Specific projects, such as the Grade/Dukes timber sale, must be analyzed by the Forest Service and the analysis must show that each project is consistent with the plan."); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1377-78 (9th Cir. 1998) (holding that the Forest Service was not in compliance with NFMA where its site-specific project was inconsistent with the forest plan of the entire forest); *Friends of Southeast's Future*, 153 F.3d at 1068 n.4 ("16 U.S.C. § 1604(i) plainly imposes a legal obligation on the Forest Service to ensure that timber sales are consistent with the relevant Forest Plan.").

Our scope of review does not include attempting to discern

---

[7]We refer to each of these standards as Big Game Standard #1, #2, #3, or #4. We recite only the beginning of Big Game Standard #4, which continues and provides a maximum open road density for big game hunting season that depends on the percentage of hiding cover in an area.

which, if any, of a validly-enacted Forest Plan's requirements the agency thinks are relevant or meaningful. If the Forest Service thinks any provision of the 1986 HNF Plan is no longer relevant, the agency should propose amendments to the HNF Plan altering its standards, in a process complying with NEPA and NFMA, rather than discount its importance in environmental compliance documents.

## 2

[2] The administrative record shows that there are 14,112 acres of potential hiding cover in the 45,675 acre Sheep Creek elk herd unit or drainage, and that the proposed project would subtract 620 acres, leaving 13,492 acres of hiding cover. NEC does not dispute these figures. Rather, NEC takes issue with the Forest Service's calculation denominator: the area over which the agency determined the hiding cover percentage. The question is whether we can reasonably discern from the record that the Forest Service complied with the HNF Plan's Big Game minimum hiding cover standard, HNF Plan Big Game Standard #3, and thereby complied with NFMA. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (holding that courts must " 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned' " (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974)).

We are unable to determine from the record that the agency is complying with the forest plan standard. The HNF Plan's hiding cover standard can be read to require the hiding cover percentage be calculated over the entire elk herd unit or drainage, or only over the summer range portion of that elk herd unit.[8] However, the Elkhorn Project EIS and ROD did not cal-

---

[8]NEC argues that the hiding cover analysis should have been completed over the entire Sheep Creek herd unit, or 45,675 acres, because the standard must "be maintained at 35 percent or greater . . . in drainages or elk herd units." If the 45,675 acre Sheep Creek herd unit or drainage was used

culate hiding cover over either: The EIS does not include a hiding cover calculation for the Sheep Creek elk herd's entire range or drainage, nor does the EIS include a mathematical determination of the Sheep Creek herd's summer range from which to calculate the hiding cover percentage. Instead, the EIS relied on the fact that about 24,000 acres of the 46,000-acre Sheep Creek Elk Herd Unit are within the Helena National Forest and estimated that the Sheep Creek elk herd's summer range was, as the Forest Service said in its briefing, "roughly equivalent" to the HNF Forest boundary. This 24,000 acre denominator was the baseline from which the agency reached its conclusion that the project complied with the Forest Plan standard. In addition, the 2001 EIS measured hiding cover within the Helena National Forest area that corresponds to the 24,000 acre denominator, but not whether any hiding cover existed in the area inhabited by the Sheep Creek herd beyond the boundary of the Helena National Forest.

An agency's position that is contrary to the clear language of a Forest Plan is not entitled to deference. *Friends of Southeast's Future*, 153 F.3d at 1069. Here, the Forest Service's hiding cover calculations considered only the section of the Sheep Creek elk herd's range within the boundaries of the Helena National Forest and not the parts of the elk herd's range located on private or other, non-HNF public lands. The agency's interpretation is inconsistent with the language of the forest plan:

as the calculation denominator, the hiding cover percentage would be thirty percent, under the HNF Plan minimum percentage of thirty-five percent, before the effects from the proposed project. The Forest Service argues that only the "summer range" portion of the elk herd unit need be included in the hiding cover calculation for it to comply with the hiding cover standard, because the thirty-five percent minimum is only required over the herd's summer range ("elk summer range will be maintained at 35 percent or greater hiding cover"). The Forest Service's interpretation of the Forest Plan language in this regard is not plainly erroneous or facially inconsistent with the Plan's language. *See Forest Guardians*, 329 F.3d at 1099.

> An environmental analysis for project work will include a cover analysis. The cover analysis should be done on a *drainage or elk herd unit basis*. . . . Subject to hydrologic and other resource constraints, elk summer range will be maintained at 35 percent or greater hiding cover . . . *in drainages or elk herd units*.

(emphasis added). The hiding cover standard does not allow the Forest Service to exclude private and other non-HNF public lands within the Sheep Creek elk herd's range from its hiding cover calculation perimeters, as the agency did in the Elkhorn project EIS.

[3] In *Neighbors of Cuddy Mountain v. U.S. Forest Service*, the Forest Plan of the Payette National Forest required the Forest Service to show that any approved projects would leave five-percent old growth forest within each affected "pileated woodpecker's home range." 137 F.3d at 1377-78. The Forest Service concluded that the approved project would meet the Forest Plan standard by calculating the minimum old-growth percentage using the area of the proposed timber sale rather than the woodpecker's range. *Id.* We reversed the district court's grant of summary judgment to the Forest Service, holding that, *inter alia*, the agency "did not demonstrate that the Grade/Dukes project would be consistent with the Payette LRMP, and thus it failed to comply with the NFMA." *Id.* at 1378. As in *Neighbors of Cuddy Mountain v. U.S. Forest Service*, in the 2001 EIS in this case, the Forest Service used an incorrect denominator in attempting to comply with the Forest Plan standard, calculating the Sheep Creek elk herd's hiding cover over only the sections of the Sheep Creek elk herd within the Helena National Forest boundaries, rather than calculating the percentage over the Sheep Creek elk herd's "drainage or elk herd unit." The EIS thus did not ensure that the Elkhorn project would comply with the HNF Plan and failed to comply with NFMA.

Under NFMA, the Forest Service calculations need not be perfect. *Forest Guardians*, 329 F.3d at 1099. However, we must still be able reasonably to ascertain from the record that the Forest Service is in compliance with the HNF Plan standard. *SEC v. Chenery Corp.*, 332 U.S. 194, 196-197 (1947) ("If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."). In this case, we cannot tell from the administrative record whether or not the Forest Service complied with the hiding cover standard. The Forest Service has given several substantially varying perimeters of how it measures whether the Sheep Creek elk herd's hiding cover standard is met. In contrast to its EIS calculation, the Forest Service asserts in its briefing that the Sheep Creek elk herd's summer range is actually 29,591 acres, but that the effect of the proposed project will still leave the herd with forty-three percent hiding cover on its summer range. In contrast to that figure, the record also includes two previous Forest Service calculations of the Sheep Creek summer range, in 1995 and 1996, respectively, as being 34,220 acres. Previous hiding cover analyses done over the Sheep Creek elk herd and using the entire elk herd unit as its denominator had concluded that the elk herd's hiding cover was below the thirty-five percent minimum set by the HNF Plan.[9] As recently as 1995-96, the Forest Service concluded that the Helena National Forest was generally lacking in sufficient hiding cover, and noted that "it is very difficult for most elk herd units on the Deerlodge and Helena

---

[9]Both a 1995 Environmental Assessment ("EA") and 1996 EA listed the Sheep Creek herd unit as having twenty-two percent hiding cover. Both of these earlier analyses determined hiding cover generally, for an average of all seasons, without calculating the summer and winter range cover, because the analyses were done to determine compliance with HNF Plan Big Game Standard #4, which sets the standard for hiding cover as a ratio to open road density and does not require a summer/winter calculation.

Forests to meet Forest Plan standards due to inherently low cover and a high degree of access." The Forest Service has not presented any rational explanation for its calculation change and its varying calculations do not assist us in our attempt to discern whether the agency has complied with the HNF Plan.

**[4]** Our review of the record did not disclose any other basis for the Forest Service's claim that it ensured that the project complied with the standard. The two maps of the area do not serve as documentation of how the Forest Service reached its 24,000 acre calculation in the EIS, which in any event the Service has now disavowed, or the Forest Service's more recent 29,591 acre calculation. Neither map has a legend, an accompanying study, or any other explanation for how the summer range figure was calculated by the Forest Service.[10] Given the Forest Service's contradictory calculations and the otherwise opaque nature of the record on the factual basis for the Forest Service's analysis of its compliance with the hiding cover standard, we cannot reasonably determine that the Forest Service has complied with the HNF Plan. *Nat'l Wildlife Federation*, 384 F.3d at 1170 (holding that agencies must articulate a "rational connection between the facts found and the conclusions made").

## C

We next address whether the Elkhorn project EIS complied with NEPA. As we explained in the above NFMA analysis, the EIS used a calculation denominator that is inconsistent with the hiding cover requirement of the HNF Plan. The HNF

---

[10]The absence of any support for the Forest Service's summer range calculation is highlighted by the Sheep Creek herd's winter range determination, which was based on a ten-year USFS study tracking the Sheep Creek herd using radio-collars and which is not challenged by NEC on appeal. The Forest Service admits that, although the same study generally described the Sheep Creek elk herd's summer range, it did not calculate it.

plan hiding cover standard does not allow the Forest Service to calculate elk hiding cover over only the part of the elk herd's range within the Helena National Forest, excluding private and other non-HNF public lands within the Sheep Creek elk herd's summer range from its calculations, as the agency did in the EIS.

[5] To take the required "hard look" at a proposed project's effects, an agency may not rely on incorrect assumptions or data in an EIS. 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."). By the Forest Service's estimate, the 24,000 acre calculation used in the EIS is more than 5,000 acres smaller than the area the Forest Service now argues is the Sheep Creek elk herd's summer range. The agency is required to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." 40 C.F.R. § 1502.24. The Forest Service did not disclose in the Elkhorn project EIS that its hiding cover measurement was done over an improper (and as it now acknowledges, smaller) area. *Lands Council v. Powell*, 395 F.3d 1019, 1032 (9th Cir. 2005) (holding that NEPA requires "up-front disclosures of relevant shortcomings in the data or models" and that withholding such information violates the statute). The Forest Service's use of a hiding cover denominator in the EIS other than that allowed by the HNF Plan arbitrarily and capriciously skewed the EIS's elk herd hiding cover percentage. Consequently, the Elkhorn project EIS did not provide a "full and fair" discussion of the potential effects of the project on elk hiding cover and did not "inform[ ] decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts" on the Sheep Creek elk herd. *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993 (quoting 40 C.F.R. § 1502.1); *see also Animal Def. Council v. Hodel*, 840 F.2d 1432, 1439 (9th Cir. 1988) ("Where the information in the initial EIS was so incomplete or misleading that the decisionmaker and the public could not make an informed comparison of the alterna-

tives, revision of an EIS may be necessary to provide a reasonable, good faith, and objective presentation of the subjects required by NEPA.") (internal quotation marks omitted), *amended by* 867 F.2d 1244 (9th Cir. 1989).

## III

**[6]** The decision by the Forest Service to approve the Elkhorn project violates both NFMA and NEPA. In an administrative appeal, we cannot divine the grounds for government decisions that are not explained or apparent. The Forest Service has failed to provide us with a satisfactory explanation supported by the record showing the necessary rational basis for its hiding cover calculation. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (holding that agency actions must be reversed as arbitrary and capricious when the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (internal quotation marks omitted). The Elkhorn project EIS utilized a calculation denominator that was plainly inconsistent with the Forest Plan standard. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d at 1377-78. In our own review of the administrative record, we are unable to discern that the Forest Service's hiding cover calculations complied with the requirements of the HNF Plan. *Fed. Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976) (per curiam) ("If the decision of the agency is not sustainable on the administrative record made, then the . . . decision must be vacated and the matter remanded . . . for further consideration.") (alteration in the original) (internal quotation marks omitted). Because the record does not include a basis for the Forest Service's conclusion that the project will not violate the HNF Plan's hiding cover standard, the agency's approval of the project was arbitrary and capricious and a violation of NFMA.[11]

---

[11]Because the Forest Service has not ensured the project is in compliance with the elk hiding cover standard, it has also acted in an arbitrary

**[7]** The Elkhorn project EIS is inadequate under NEPA because, by using a hiding cover calculation denominator that is inconsistent with that required by the HNF plan, the agency did not take a "hard look" at the project's true effect and failed to inform the public of the project's environmental impact.

We reverse and remand this case to the Forest Service for further proceedings consistent with this opinion.[12]

**REVERSED and REMANDED.**

---

and capricious manner in violation of the Elkhorn Wildlife Unit direction that projects only be considered when they are compatible with the management direction for wildlife. The proposed project fails to abide by the HNF Plan's elk hiding cover standard, in the area specifically delineated by the Forest Service to protect that species.

[12]It is unnecessary for us to reach NEC's argument that the Forest Service's approval of the proposed project was arbitrary and capricious on the theory that the agency has failed to protect the forest-wide viability of the Northern Goshawk. NEC relied on evidence outside the administrative record in support of its argument of inadequate monitoring of the Northern Goshawk in the Helena National Forest. Upon remand, subject to agency regulations, NEC may have the opportunity to introduce evidence on goshawk monitoring before the agency in the first instance. We deny NEC's motion to supplement the record on appeal.