**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FOREST GUARDIANS,
             *Plaintiff-Appellant,*

v.

MIKE JOHANNS, Secretary of
Agriculture; UNITED STATES FOREST
SERVICE,

             *Defendants-Appellees.*

No. 04-16179

D.C. No.
CV-01-00138-DCB

OPINION

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted
February 15, 2006—San Francisco, California

Filed June 13, 2006

Before: Stephen Reinhardt, Richard A. Paez, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Reinhardt

**COUNSEL**

Robert B. Wiygul, Waltzer & Associates, Biloxi, Mississippi, for the plaintiff-appellant.

Thomas L. Sansonetti, Assistant Attorney General, Lisa Russell, M. Alice Thurston and David C. Shilton, United States Department of Justice, Washington, D.C.; and Mary Ann Joca, United States Department of Agriculture, Albuquerque, New Mexico, for the defendants-appellees.

**OPINION**

REINHARDT, Circuit Judge:

Forest Guardians appeals the district court's determination that the United States Forest Service did not violate the Endangered Species Act when it failed to re-initiate consultation on the environmental impact of cattle grazing on a plot of national forest land in Arizona. Forest Guardians urges that the Forest Service was required to re-consult because it failed to comply with the agreed-upon criteria governing the monitoring of the grazing's impact on endangered and threatened species living in the Water Canyon Allotment of the Apache-Sitgreaves National Forests. We agree that the Forest Service's failure to re-initiate consultation on Water Canyon violated the Endangered Species Act, and reverse the judgment of the district court.

I

*Endangered Species Act*

The Endangered Species Act (ESA) contains substantive and procedural provisions designed to protect species listed as threatened or endangered under the Act. The substantive provision relevant to this appeal is § 7, which prohibits federal agencies such as the Forest Service from taking discretionary actions that would "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ." 16 U.S.C. § 1536(a)(2).

An agency's decision whether to take a discretionary action that may jeopardize endangered or threatened species is strictly governed by ESA-mandated inter-agency consultation procedures. *Id*. § 1536(c); *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985) ("[T]he strict substantive provisions of the ESA justify *more* stringent enforcement of its procedural

requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions."). First, the agency contemplating the action must request information from the appropriate federal wildlife service regarding "whether any species which is listed or proposed to be listed may be present in the area of such proposed action." 16 U.S.C. § 1536(c)(1). In this case, the appropriate wildlife service is the United States Fish and Wildlife Service (FWS).[1] If the wildlife service determines that listed species may be present in the affected area, the agency preparing to act must produce a "biological assessment" in accordance with the National Environmental Policy Act "for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." *Id.* If the biological assessment concludes that listed species are in fact likely to be adversely affected, the agency ordinarily must enter "formal consultation" with the wildlife service. *Id.* § 1536(a)(2); *Thomas*, 753 F.2d at 763. Formal consultation requires the wildlife service to produce a "biological opinion" that evaluates the nature and extent of the proposed action's effect on the listed species and that, if necessary, posits reasonable and prudent alternatives to the proposed action. 16 U.S.C. § 1536(b)(3)(A); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994).

Following the issuance of a biological assessment which determines that listed species are likely to be adversely affected, the agency may, however, attempt to avoid the lengthy and costly process of formal consultation with the service by voluntarily initiating a less rigorous regulatory procedure called "informal consultation." 50 C.F.R. § 402.13.

> Informal consultation is an optional process that
> includes all discussions, correspondence, etc.,

---

[1]FWS has jurisdiction over freshwater and terrestrial species while the National Marine Fisheries Service is responsible for anadromous and marine species. 50 C.F.R. § 402.01(b).

between the [Fish and Wildlife] Service and the Federal agency . . . designed to assist the Federal agency in determining whether formal consultation or a conference is required. If during informal consultation it is determined by the Federal agency, with the written concurrence of the [Fish and Wildlife] Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.

*Id*. § 402.13(a). In other words, regardless of whether a biological assessment concludes that a proposed action would likely adversely affect listed species, if informal consultation is initiated and results in a finding that the proposed action would not in fact have such an effect, the agency is not required to engage in formal consultation. *Id*. § 402.14.[2]

There may be an additional step in the process, however, in some cases. Informal consultation must be re-initiated when (1) "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," *id*. § 402.16(b), or (2) "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion," *id*. § 402.16(c).

The issue in this case is whether re-initiation of informal consultation is required with respect to Water Canyon as a result of the Forest Service's failure to comply with certain of the guidance criteria established during the initial informal consultation process regarding that allotment. We must also examine whether the case has become moot while on appeal.

---

[2]Under 50 C.F.R. § 402.14(b)(1), "[a] federal agency need not initiate formal consultation if, as the result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the [Fish and Wildlife] Service under § 402.13, the Federal agency determines . . . that the proposed action is not likely to adversely affect any listed species or critical habitat."

*Factual and Procedural Background*

The Forest Service regulates livestock grazing in national forests and on other federal land under its jurisdiction. All livestock use of national forest land must be authorized by Forest Service-issued grazing permits, which are typically granted for ten-year terms. 36 C.F.R. § 222.3. Permits are issued for designated land allotments and must be accompanied by land management plans. *Id*. § 222.2. Each grazing permit and corresponding land management plan is subject to site-specific environmental analysis in accordance with federal law. *Id.*; *see also Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1511 (9th Cir. 1992).

In 1997, Forest Guardians and several co-plaintiffs filed a lawsuit challenging more than one thousand Forest Service-issued grazing permits for national forest land in Arizona and New Mexico. The complaint alleged that the Forest Service violated the ESA by failing to consult with FWS prior to issuing the permits. In response to the lawsuit, the Forest Service initiated informal consultation with FWS on each challenged allotment. However, because there were so many allotments that required review, the Forest Service and FWS streamlined the informal consultation process by agreeing to create general protocols called "guidance criteria." The guidance criteria consisted of certain factual conditions which, if satisfied, would cause FWS to agree that a "not likely to adversely affect" finding would be appropriate. Thus, if the Forest Service would ensure that the guidance criteria conditions were met with respect to a given allotment, the agency was permitted to presume that FWS concurred in the "not likely to adversely affect" finding for that allotment.

Forest Guardians' 1997 action targeted, among others, the grazing permit for the Water Canyon Allotment, which covers approximately 52,000 acres of the Apache-Sitgreaves National Forests in Arizona. Water Canyon is home to numerous ESA-listed species, including the Mexican spotted owl

and the Little Colorado spinedace, a type of minnow. The allotment's land management plan permitted eighty-six cow/calf pairs to graze for four months annually. The management plan established maximum utilization levels[3] for each grazed pasture in the allotment; it assigned to ten pastures a 25 percent level and to the remaining four pastures a 35 percent level. The plan also required that the Forest Service, at a minimum, monitor the utilization levels of *each* grazed pasture at the mid-point of the scheduled use period. The plan recommended additional monitoring prior to livestock entry and at the end of the use period, but mid-point measuring was compulsory because it would allow the Forest Service to make operational changes if necessary to reflect actual range conditions.

In August 1998, the Forest Service and FWS entered into an agreement establishing guidance criteria that governed livestock grazing pursuant to Water Canyon's land management plan. The agreement adopted the management plan's environmental requirements. It explained that the monitoring of the utilization levels was critical to the continued existence of the affected species and emphasized that the Mexican spotted owl required forage sufficient to provide habitat for its rodent prey species. It also stated that restricted utilization levels were important because they allowed for controlled fires that reduced the risk of "catastrophic wildfire" in the region. The agreement provided that, for the life of each ten-year grazing permit, "yearly confirmation throughout the lifetime of the permit must take place to ensure the criteria for those findings continue to be met." In other words, the Forest Service was allowed to presume annual concurrence by FWS in the "not likely to adversely affect" finding only if it confirmed each year that the guidance criteria were being satisfied.

---

[3]Utilization refers to the amount of forage consumed by grazing livestock. Permissible utilization levels vary according to, among other things, the condition and character of the range, the type of forage, and the needs of local plants and animals.

In September 1998, as a result of the adoption of the guidance criteria for the Water Canyon Allotment, the Forest Service issued a "not likely to adversely affect" biological assessment with respect to several species including the Mexican spotted owl and the Little Colorado spinedace. On June 22, 1999, the Forest Service issued a notice of decision to permit grazing on Water Canyon. The grazing permits took effect that year.

In April 2001, Forest Guardians commenced this lawsuit under the citizen suits provision of the ESA, 16 U.S.C. § 1540(g). Its complaint alleged that the Forest Service violated the ESA by not re-initiating consultation after the agency failed over several years to meet the guidance criteria for approximately thirty national forest allotments, including Water Canyon. Specifically, Forest Guardians alleged that the Forest Service had failed to conduct adequate annual monitoring of utilization levels on numerous grazed allotments identified in the complaint and that, as a result, the continuing "not likely to adversely affect" findings for those allotments were invalid. It contended that re-initiation of consultation was required to obtain FWS's annual concurrence in the findings because such concurrence could no longer be presumed. The complaint sought declaratory judgment that the Forest Service's actions violated the ESA and an injunction requiring the agency to re-initiate consultation on the challenged allotments.

The district court addressed, several times, the Forest Service's alleged failure to monitor utilization levels on the challenged allotments. In an order dated October 22, 2002, the court rejected Forest Guardians' argument that each instance in which the Forest Service failed to monitor in accordance with the management plans and guidance criteria *per se* triggered re-initiation of consultation. In doing so, however, the district court noted:

> Monitoring the effectiveness of the utilization standards is the specified mechanism by which the

> Defendant ensures that grazing on an allotment is "not likely to adversely affect" endangered and protected species. This explains why the Biological Assessments . . . tie the "not likely to adversely affect" determinations to utilization levels and why they require ongoing monitoring of grazing utilization.

The district court nevertheless found that inadequate monitoring by itself could not trigger re-consultation under 50 C.F.R. § 402.16 without a showing that "noncompliance has modified the agency action to an extent that causes an affect [sic] not previously considered."

On March 17, 2004, following cross-motions for summary judgment, the district court issued a summary judgment order addressing each allotment challenged by Forest Guardians. The court found that the Forest Service was required to re-initiate § 7 consultation on some allotments but that it was not required to do so for several others, including Water Canyon. With respect to the Water Canyon Allotment, the district court found that "monitoring on this large allotment leaves much to be desired."

The undisputed evidence showed that, in 1999, only one pasture on the Water Canyon Allotment was monitored for utilization level compliance notwithstanding the fact that three pastures were grazed. Several sites on that one pasture were measured, and each measurement taken at the mid-point of the use term for that pasture was less than 25 percent. In 2000, the Forest Service again monitored only one pasture although several were grazed. That time, one of the four mid-point measurements was 39.5 percent, which exceeded the allowable 25 percent level. No operational changes were made to accommodate the excessive utilization. In 2001, the Forest Service conducted no mid-point monitoring of one grazed pasture, although it did do so for two others. In 2002, two of the three recorded sites on the single monitored pasture

exceeded 25 percent — one measured 31 percent and the other 72 percent, with both measurements taken at the end of the grazing season.

Despite these findings for Water Canyon, the district court concluded that re-initiation of consultation on the allotment was not required. It based its conclusion primarily on evidence that, in 2001 and 2002, only seventy-four cow/calf pairs grazed Water Canyon instead of the eighty-six that the biological assessment concluded would support a "not likely to adversely affect" finding. The district court reasoned as follows: "Because utilization levels correspond to stocking levels, even though monitoring has been inadequate, the Court finds that the required utilization levels for the allotment are in place." It found that the "inadequate" monitoring was sufficient to establish that the guidance criteria supporting the "not likely to adversely affect" finding were met. The district court entered judgment on April 6, 2004.

Forest Guardians appealed the district court's judgment only with respect to the Water Canyon Allotment. On October 20, 2004, just two days before the Forest Service filed its responsive brief, it re-initiated consultation on Water Canyon.[4] As a part of that process, it sent FWS notice that "the original effects determinations have not changed" and therefore the continued grazing would not likely adversely affect any listed species on the allotment, including the Mexican spotted owl and the Little Colorado spinedace. FWS subsequently concurred in writing in the Forest Service's "not likely to adversely affect" finding.

---

[4]The Forest Service requested and was granted a one-month extension of time within which to file its responsive brief. It re-initiated consultation on Water Canyon just before the end of that period.

## II

*Mootness*

The first issue that we must address is jurisdictional. The Forest Service contends that this appeal is moot because the agency re-initiated consultation on Water Canyon and subsequently received FWS's concurrence in its renewed "not likely to adversely affect" finding. The Forest Service argues that, as a result of this recent re-consultation, there is no effective relief that the district court can grant.

**[1]** Federal courts lack jurisdiction to consider "moot questions . . . or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). An action is moot "if it has lost its character as a present, live controversy." *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997). The party asserting mootness bears the burden of establishing that there is no effective relief that the court can provide. *S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1134 (9th Cir. 2004). That burden is "heavy"; a case is not moot where *any* effective relief may be granted. *Northwest Envtl. Defense Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988).

The only court of appeals case cited by the Forest Service in its effort to meet its burden is *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724 (10th Cir. 1997). In *SUWA*, the plaintiff alleged that the Bureau of Land Management (BLM) violated § 7 of the ESA by failing to consult with FWS on a management plan for BLM land that was home to a listed species of plant life. 110 F.3d at 725. The management plan required BLM to close certain access routes used by off-road vehicles but to leave open several others. *Id.* at 726. The plaintiff sought declaratory and injunctive relief — principally, it requested a stay of the management plan pend-

ing consultation regarding the impact on the listed plant life of off-road vehicle use on the still-open access routes. *Id.* While the matter was pending in the district court, BLM initiated and completed consultation with FWS on the challenged plan. The district court subsequently ruled against the plaintiff on the merits and also found that the action was moot as a result of the inter-agency consultation. *Id.* at 727. The Tenth Circuit affirmed, ruling that "[t]here is no point in ordering an action that has already taken place." *Id.* at 728. However, the court expressly narrowed its holding:

> This is not to say that a violation of section 7(a)(2) could always be cured by subsequent consultation, nor is this general approval for consultation after the fact. Instead, this merely recognizes that the changed circumstances of this particular case no longer present an opportunity for meaningful relief. . . . A declaratory judgment would serve no purpose in this case. This case does not involve a continuing violation or practice, and SUWA has not shown that the defendants are likely to violate section 7(a)(2) in the near future. A declaratory judgment would not affect the matter, and would be in the nature of an advisory opinion.

*Id.* at 729-20.

**[2]** *SUWA* is distinguishable in two critical ways from the case before us. First, our case does involve a continuing practice. The grazing permit for Water Canyon has a ten-year term and requires that the Forest Service obtain from FWS annual concurrence that the guidance criteria governing the "not likely to adversely affect" finding have been met. Second, the Forest Service's practice of not complying with the monitoring requirements is likely to persist despite the recent reconsultation. Notably, the Forest Service has argued throughout this litigation that it is not required to meet the monitoring requirements incorporated in the guidance criteria. The Forest

Service asserts that those requirements are "unreasonable." Declaratory judgment in favor of Forest Guardians would thus ensure that the Forest Service does not continue to fail to meet its monitoring responsibilities in the future and that it fulfills its duty under the ESA to consult with FWS when necessary.

[3] We have repeatedly held that where, like here, both injunctive and declaratory relief are sought but the request for an injunction is rendered moot during litigation, if a declaratory judgment would nevertheless provide effective relief the action is not moot. *See, e.g.*, *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1174-75 (9th Cir. 2002); *Northwest Envtl. Defense Ctr.*, 849 F.2d at 1245. In *Northwest Environmental Defense Center*, for instance, a federal agency charged with ensuring the viability of salmon fisheries in the Pacific Northwest set a 1986 salmon escapement goal that did not meet the requirements of its own fishery management plan. 849 F.2d at 1243. The plaintiff filed a lawsuit requesting an injunction requiring the agency to meet the management plan's escapement goal and a declaratory judgment that the agency violated various environmental laws. *Id.* at 1244. After the 1986 salmon season ended, the district court dismissed the action as moot. We reversed, ruling that, although the request for an injunction was rendered moot, a declaratory judgment could help to remedy the effects of the agency's statutory violations and to ensure that similar violations would not occur in the future: "In deciding such a case the court is not merely propounding on hypothetical questions of law, but is resolving a dispute which has present and future consequences." *Id.* at 1245.

[4] Here, although it is true that the only agency action sought by Forest Guardians in this appeal — re-initiation of informal consultation on Water Canyon — has already occurred, that is not the only form of effective relief that Forest Guardians seeks or that the district court may grant. As discussed above, a declaratory judgment that the Forest Service's actions relating to Water Canyon violated the ESA

would provide effective relief by governing the Forest Service's actions for the remainder of the allotment's permit term and by prohibiting it from continuing to violate the law.[5] It would, accordingly, "resolve a dispute with present and future consequences." *Id*. Because such relief remains available to Forest Guardians notwithstanding the Forest Service's re-initiation of consultation on Water Canyon, the agency has failed to carry its burden to establish mootness. *See id.* at 1244.

*Failure to Re-Initiate Consultation*

The gravamen of this appeal is Forest Guardian's contention that the Forest Service violated § 7 of the ESA first in failing to monitor adequately utilization levels in Water Canyon and then, as a result of that failure, in failing to re-initiate consultation with FWS. Forest Guardians argues that utilization monitoring was required to ensure that the guidance criteria critical to FWS's annual concurrence in the "not likely to adversely affect" finding were being met.

[5] The parties do not dispute that the Forest Service failed to monitor Water Canyon in accordance with the allotment's guidance criteria. The agency acknowledges that it did not measure the mid-point utilization levels for each grazed pasture on Water Canyon from 1999 through 2002 and that some of the measurements actually taken exceeded allowable utilization levels. The issue is, as the district court correctly found, whether that failure to monitor triggered a duty to re-initiate inter-agency consultation under 50 C.F.R. § 402.16. Pursuant to § 402.16, consultation is required where "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that

---

[5]We note also that such a judgment could guide the Forest Service's conduct relating to its authorization and monitoring of cattle grazing on national forest land throughout the Circuit, although this factor does not affect our legal analysis of the mootness issue in this case.

was not considered in the biological opinion." 50 C.F.R. § 402.16(c). It is the action agency's burden to show the absence of likely adverse effects on listed species. 16 U.S.C. § 1536(a)(2).

**[6]** Both parties rely upon *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987); in fact, it is the principal case relied upon by the Forest Service to support its argument that re-consultation was not triggered in this case. In *Sierra Club*, the plaintiff filed a lawsuit against several defendants including the Army Corps of Engineers (COE) arising from the federal government's plan to construct a portion of interstate highway in San Diego through habitat designated as critical to endangered bird species. Inter-agency consultation resulted in a proposed action that was granted "not likely to adversely affect" status contingent upon the implementation of a mitigation plan to acquire adjacent replacement marshland for the affected species. *Sierra Club*, 816 F.2d at 1379-80. COE failed to secure the replacement marshland and, as a result, FWS requested re-initiation of consultation, which COE refused. *Id.* at 1381. We held that COE violated 50 C.F.R. § 402.16 by not re-initiating consultation because during initial consultation the replacement habitat was deemed "necessary to minimize the project's effects," and the COE's failure to secure that land constituted new information that affected the listed species "in a manner or to an extent not previously considered" in the approved plan. *Id.* at 1388. Similarly, in this case, the agencies deemed maintenance of proper utilization levels necessary to minimize the adverse effects of grazing on Water Canyon, and the Forest Service's failure to monitor utilization affected listed species in a manner or to an extent not considered in the land management plan and guidance criteria. Thus, a plain reading of *Sierra Club* would appear to favor Forest Guardians' argument and to require summary judgment in its favor.

The Forest Service seizes upon the following language from *Sierra Club* to argue that the case is distinguishable from

the instant case and that *Sierra Club*'s guiding principles actually favor its position:

> We do not hold that every modification of or uncertainty in a complex and lengthy project requires the action agency to stop and reinitiate consultation. The circumstances here go far beyond the problems and doubts associated with any large endeavor. The creation and management of a refuge for the birds is the most important of many modifications the FWS considered absolutely necessary to insure that the project was not likely to jeopardize their continued existence.

*Id*. The Forest Service contends that its failure to monitor utilization levels adequately on Water Canyon raises a "minor dispute" compared to the consultation-triggering modification at issue in *Sierra Club*.

[7] We disagree that the "dispute" here is minor or inconsequential. There can be no doubt that the utilization monitoring provisions governing grazing on Water Canyon were critical to the biological assessment's "not likely to adversely affect" determination and constituted an essential element of the guidance criteria designed to ensure the determination's continued validity. As the district court found, "[m]onitoring the effectiveness of the utilization standards is the specified mechanism by which the Defendant ensures that grazing on an allotment is 'not likely to adversely affect' endangered and protected species." The Forest Service itself acknowledged the vital nature of utilization monitoring to FWS's continued concurrence in the allotment's 1998 biological assessment: In a May 2000 memorandum to forest rangers, a Forest Service supervisor stated that "if utilization standards were exceeded, or were inadequately monitored to determine if they were or were not met, then the initial determination might not be valid."

We are also persuaded by our reasoning in *Gifford Pinchot Task Force v. United States Fish and Wildlife Service*, 378 F.3d 1059 (9th Cir. 2004). In *Gifford* the plaintiffs challenged FWS's authorization of the Northwest Forest Plan (NFP), a broad-reaching timber harvest plan for national forest land in Washington, Oregon, and California that affected the ESA-listed Northern spotted owl. The NFP, like the guidance criteria in this case, was a general protocol containing guidelines that, if followed for a particular tract of forest land, would automatically result in a no-jeopardy finding. *Gifford*, 378 F.3d at 1064-65. The plaintiffs disputed FWS's reliance upon the NFP in lieu of individualized analyses of each forest tract, but we upheld the plan in large part because its implementation was being carefully monitored:

> If such effectiveness monitoring were not taking place, or if the on-going monitoring reveals that the NFP is not meeting expectations, we would not allow the FWS to rely simply upon the NFP's predictions. Without such affirmative evidence, however, we refrain from punishing the FWS for relying on the unique and extensive Northwest Forest Plan.

*Id.* at 1068.

**[8]** Here, there was affirmative evidence not only of deficient monitoring on Water Canyon but also of utilization levels that exceeded the permissible standards under the guidance criteria. For instance, in 2000 one of the mid-point measurements of a grazed pasture on Water Canyon exceeded 25 percent and, in 2002, two of the three recorded utilization levels exceeded allowable limits for the same pasture. One of the sites monitored in 2002 measured 72 percent utilization, nearly three times the maximum allowable level.

In addition to its reliance on *Sierra Club*, the Forest Service makes two principal arguments why deficient monitoring and excessive recorded utilization levels do not trigger re-

consultation under 50 C.F.R. § 402.16. First, it contends that "Forest Guardians has set an unreasonable standard for monitoring which would treat the monitoring provisions of the 1998 Criteria as if they were rigid regulatory requirements." That argument is unpersuasive for at least two reasons. First, from 1999 through 2002, the Forest Service annually monitored only one of the three grazed pastures on Water Canyon during three of the years and two of the three grazed pastures in the fourth year. In two of the four years, excessive utilization levels were recorded. Second, Forest Guardians did not establish the monitoring standard — the Forest Service and FWS agreed to the methodology during inter-agency consultation which resulted in the initial "not likely to adversely affect" biological assessment for Water Canyon. The two federal agencies also established the requirement of annual confirmation that the guidance criteria have been met. The Forest Service may not secure a "not likely to adversely affect" finding contingent upon its agreeing to certain critical conditions, ignore them most of the time, and then assert that the conditions are unreasonable.

The Forest Service also argues that the district court was correct to assume that, despite deficient monitoring, the utilization levels required by the criteria would automatically result from reduced cattle stocking of Water Canyon. We disagree with the Forest Service and the district court in this regard.[6] In considering only stocking levels and disregarding the agreed-upon guidance criteria, the district court cited no evidence that stocking levels are so strongly correlated to utilization levels that monitoring is unnecessary when an allotment is not fully stocked. In fact, the most recent evidence before the district court on Water Canyon indicated that this assump-

---

[6]We nevertheless recognize that the district court did an excellent job adjudicating this complicated case. The court's thoroughness and careful reasoning are evident from the record and from its rulings. Nevertheless, we must conclude that it erred with respect to the single issue regarding Water Canyon that is the subject of this appeal.

tion was, at least in this instance, incorrect: In 2002, only seventy-four cow/calf pairs grazed on the allotment (instead of the eighty-six contemplated by the biological assessment), and yet two of the three measured sites recorded excessive utilization levels.

[9] The record in this case compels the conclusion that the Forest Service was required under the ESA to re-initiate informal consultation with FWS on the Water Canyon Allotment. The material inadequacy of the Forest Service's utilization monitoring and the results of the limited measurements that were taken constituted modifications to the allotment's land management plan that affected listed species in a manner and to an extent not previously considered. *See* 50 C.F.R. § 402.16(c); *see also Sierra Club*, 816 F.2d at 1388. We do not hold that each isolated instance in which the Forest Service deviated from Water Canyon's guidance criteria required the agency to re-initiate consultation. The Forest Service's arguments to the contrary notwithstanding, the case before us is not comprised of infrequent and insignificant deviations. Rather, the undisputed facts are that (1) the guidance criteria expressly stated that the utilization levels specified by the land management plan were necessary to protect the ESA-listed species in Water Canyon, (2) the Forest Service regularly failed to meet the monitoring requirements on which the "not likely to adversely affect" determination for those species was premised, and (3) the evidence that the Forest Service did obtain as a result of its deficient monitoring suggested that maximum permissible utilization levels were being exceeded. In light of these facts, the Forest Service's failure to re-initiate consultation violated the ESA.

III

The district court's judgment that the Forest Service did not violate the Endangered Species Act by failing to re-initiate consultation on the Water Canyon Allotment is reversed with

directions to enter summary judgment in favor of Forest Guardians.

**REVERSED** and **REMANDED** for entry of summary judgment in favor of Appellant.